Robert L. Levy
Sherie N. Buell
BANTLE & LEVY LLP
817 Broadway
New York, New York 10003
(212) 228-9666
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

BINA RADOSTI,

        Plaintiff,

        - against -

HUDSON'S BAY COMPANY d/b/a LORD &
TAYLOR and LORD & TAYLOR LLC,

        Defendant.

------------------------------------------------------------------x

No. \_\_-CV-\_\_\_\_
ECF Case

**COMPLAINT**
**AND JURY DEMAND**

        Plaintiff Bina Radosti, by her attorneys, Bantle & Levy LLP, as and for her complaint against defendants, Hudson's Bay Company d/b/a Lord & Taylor and Lord & Taylor LLC, allege as follows:

## NATURE OF THE ACTION

        1.    This is an action for employment discrimination and unlawful retaliation based on disability and age in violation of the New York City Administrative Code § 8-101 et seq. (the "NYCHRL"). Plaintiff seeks declaratory and injunctive relief and damages.

        2.    This is also an action for violations of federal and state labor laws based on failure to pay Plaintiff for overtime under the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq., as amended ("FLSA"), Articles 6 and 19 of the New York Labor Law, § 190 et seq. and § 650 et seq. ("NYLL"), and 12 N.Y.C.R.R. § 142-2.2 (the "Overtime Rate Order"), and unlawful

deductions under the NYLL, including applicable liquidated damages, interest, attorneys' fees, and costs. Plaintiff also brings this action for wrongful discharge in violation of the FLSA, 29 U.S.C. § 201 *et seq.*, and NYLL, § 200 *et seq.*, based on retaliation for making complaints about unpaid overtime.

## JURISDICTION AND VENUE

3.　　The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 ("federal question"), 28 U.S.C. § 1332(a) ("diversity"), and the FLSA, 29 U.S.C. § 216. The Court has supplemental jurisdiction over Plaintiff's NYCHRL, NYLL, and Overtime Rate Order claims pursuant to 28 U.S.C. §1367(a).

4.　　This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity of citizenship) insofar as the amount in controversy exceeds $75,000 and the action is between citizens of different states.

5.　　Upon information and belief, Plaintiff is a citizen of New Jersey, Defendant Hudson's Bay Company is a citizen of Canada, and none of Defendant Lord & Taylor LLC's member owners are citizens of New Jersey.

6.　　A substantial part of the acts giving rise to this action were committed within the district of the United States District Court, Southern District of New York, and venue is properly lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

7.　　Plaintiff Bina Radosti is a fifty-nine year old woman and citizen of the United States and the State of New Jersey.

8.      Plaintiff is also known as Bina Handa.  In 1989, Plaintiff legally changed her surname from Handa to Radosti when she got married.  Plaintiff uses her maiden name – Handa – for various personal and professional matters.

9.      Upon information and belief, defendant Hudson's Bay Company d/b/a Lord & Taylor is a Canadian retail business group which owns and operates retail stores in Canada, the United States and parts of Europe.

10.      Upon information and belief, Lord & Taylor LLC is a foreign limited liability company, doing business within the State of New York, and a subsidiary of Hudson's Bay Company.

11.      Hudson's Bay Company d/b/a Lord & Taylor and Lord & Taylor LLC (collectively "Lord & Taylor") operate retail department stores in North America, with their flagship Lord & Taylor store located at 424 5th Avenue, New York, New York 10018 (the "Flagship Store").

12.      At all times relevant to her claims, Plaintiff was an employee of Defendants at the Flagship Store in New York City.  Plaintiff was employed by Defendants within the meaning of Section 3(g) of the FLSA, 29 U.S.C. § 203(g) in an enterprise engaged in interstate commerce or in the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. § 207.

13.      At all times relevant to Plaintiff's claims, Lord & Taylor was an employer of Plaintiff and Plaintiff was employed by Lord & Taylor within the meaning of, *inter alia*, the FLSA, 29 U.S.C. § 203(d) & (e), the NYLL, §§ 190(2) & (3) and 651(5) & (6), and 12 N.Y.C.R.R. § 142-2.14(a).

14.     Defendants are a "person" within the meaning of New York City Administrative Code § 8-102(1), and an "employer" within the meaning of New York City Administrative Code §§ 8-102(5) and 8-107.

## STATEMENT OF FACTS

Radosti's Initial Employment at Lord & Taylor

15.     Radosti commenced employment with Lord & Taylor at the New York City Flagship Store on or about June 15, 2015, in the position of Manager of Personal Styling and Lead Supervisor.

16.     As Manager of Personal Styling and Lead Supervisor, Radosti's responsibilities were primarily to sell clothing, accessories, shoes, jewelry, makeup and personal styling services as part of an effort to enhance and redesign personal shopping at Lord & Taylor through lifestyle selling and a refocus on building relationships with customers.

17.     Radosti also was responsible for mentoring her team members, making sales, acquiring product knowledge, and producing reports of productivity.

18.     During the first weeks of her employment with Lord & Taylor, Radosti was sent to Toronto, Canada to learn more about Lord & Taylor's personal shopping business and engage in training on how to grow the service and manage a team of stylists and shoppers. During her training, Radosti met regularly with Leslie Young ("Young"), Director of Lord & Taylor's Personal Shopping, and shadowed top personal shoppers working in Hudson's Bay Company's high end department stores in Toronto.

19.     At the direction of Young, Radosti spearheaded implementation of a redesigned personal shopping program at the Flagship Store of Lord & Taylor.

4

20.     Radosti excelled in her role as Manager of Personal Styling and Lead Supervisor, including successfully building relationships with numerous Lord & Taylor clients and monetizing those relationships through strong customer service and cross-selling.

21.     Throughout the first few months of her employment with Lord & Taylor as Manager of Personal Styling and Lead Supervisor, Radosti consistently received positive feedback on her performance from Young, who oversaw implementation of the personal shopping program in New York City and regularly provided Radosti direct feedback on her performance.

22.     During the first months of her employment, Radosti also consistently received positive feedback from General Manager, Karyn Benvenuto ("Benvenuto"), and other executives of Hudson's Bay Company.

23.     Radosti performed so well in her position as Manager of Personal Styling and Lead Supervisor that she was selected to be filmed as a representative of Lord & Taylor for a show that aired on the Oprah Winfrey Network.

Lord & Taylor Denies Radosti's Request for a Reasonable Accommodation

24.     In or about August 2015, Radosti began to experience regular and severe pain in her feet as a result of the long hours she spent standing and walking through the Flagship Store while performing her duties at Lord & Taylor.

25.     On August 18, 2015, Radosti was attending a buying event with Benvenuto when Benvenuto told Radosti that the open-toed low wedge sandals Radosti was wearing were unacceptable and that she needed to wear high-heeled close-toed shoes while on the job as required by Lord & Taylor policy.

26.     In response, Radosti informed Benvenuto that she was wearing open-toed low wedge sandals because she was suffering from bunions, a painful medical condition that would ultimately require surgery.

27.     Radosti further advised Benvenuto that she had tried a variety of flat shoes, including sneakers, and had settled on the open-toed low wedge sandals because she considered them the most stylish and professional option given her medical needs.

28.     During this conversation, Radosti also informed Benvenuto of her degenerative back disease and her history of medical issues with her feet, including painful bunions and hammertoes.

29.     Finally, Radosti informed Benvenuto that she planned to see a doctor for her foot issues and pain and offered to submit medical documentation detailing her physician's diagnosis and memorializing the need for an accommodation as to her workplace footwear.

30.     Benvenuto rejected Radosti's offer to submit medical documentation supporting Radosti's need for an accommodation, blithely suggesting without any basis that Radosti could simply wear "Dr. Scholl's" foot products to enable her to wear high-heeled shoes despite her medical issue.

31.     Radosti responded that Dr. Scholl's foot products were not consistent with her physician's recommendation and were not sufficient to alleviate her foot pain.

32.     In good faith, Radosti ultimately purchased and tried the products recommended by Benvenuto but these products did not alleviate her foot pain.

33.     After her conversation with Benvenuto in which Benvenuto rejected Radosti's request for a reasonable accommodation, Radosti spoke with Young later in the week when Young visited the Flagship Store, regarding the footwear issue and need for an accommodation.

34.    Young told Radosti to stand her ground regarding her need to wear pain alleviating shoes, characterizing Benvenuto's reflexive citation to store policy and rejection of Radosti's request for an accommodation without any consideration of the medical documentation as "ridiculous" and totally inappropriate.

35.    In or about October 2015, Radosti saw Dr. Daniel Hennessy ("Dr. Hennessy") for her debilitating foot pain and was diagnosed with a hallux valgus deformity (commonly known as bunions) constituting a medial deviation of the first metatarsal and lateral deviation of the great toe. Dr. Hennessy advised Radosti that her foot condition likely developed, in part, due to a long-standing degenerative disc condition in Radosti's back that Radosti had successfully been managing for many years.

36.    As a result of this condition, Dr. Hennessy recommended Radosti undergo a series of physiotherapy treatments, including ultrasound and laser treatments.

37.    In addition, Dr. Hennessy directed Radosti not to wear high-heeled shoes because the shoes exacerbated her condition and were a primary cause of the pain she was experiencing.

38.    As winter approached and the weather grew colder, Radosti searched for a weather-appropriate winter shoe that would be comfortable on her feet and consistent with her physician's recommendations.

39.    After trying several different boots sold by Lord & Taylor, Radosti began wearing low heeled (less than one inch), black suede and sheepskin Ugg boots with a fur trim in the workplace.

40.    Radosti selected these Ugg boots based on the Ugg's wide toe box and stretchy suede fabric.

41.     Radosti's selection of the fur-trim Ugg boots, which she purchased at Lord & Taylor for approximately $200, reflected her ongoing effort to remain stylish in the workplace while also being true to her physician's recommendations.

42.     Radosti also selected these Ugg boots based on their aesthetic, which she felt complemented the black pencil skirts and dress pants Radosti wore as the required "uniform" at the Flagship Store.

43.     After wearing these Ugg boots in the workplace for approximately two weeks, Benvenuto stated during a meeting with Radosti that these boots were unacceptable and against store policy.

44.     In response, Radosti noted that several younger Lord & Taylor employees at the Flagship Store wore shoes contrary to store policy, including a recently hired personal shopper, Ashley Sokol ("Sokol") brought in by Benvenuto.

45.     Specifically, Radosti pointed out to Benvenuto that Sokol routinely wore hi-top sneakers on the job.

46.     Benvenuto dismissed Radosti's reference to the younger employees, including Sokol, noting that these younger employees were "fashion forward" and, therefore, the fact that they wore hi-top sneakers in the workplace was acceptable and "needed to be tolerated" despite store policy.

47.     Frustrated by Benvenuto's application of a blatant double-standard regarding application of footwear policy at the Flagship store and continued failure to consider Radosti's medical needs, Radosti again offered to submit medical documentation supporting her condition and the need for an accommodation.

48.     Benvenuto again refused to consider Radosti's medical documentation and need for an accommodation.

49.     Shortly thereafter, Radosti was advised by two assistant supervisors who reported to Benvenuto, Sam Vera ("Vera") and Blair Zebrowski ("Zebrowski"), that Benvenuto would "go crazy" if she saw Radosti wearing her Ugg boots in the workplace and that she needed to find new footwear.

50.     Upon information and belief, Vera and Zebrowski were acting at the direction of their supervisor, Benvenuto, when attempting to dissuade Radosti from wearing her Ugg boots in the workplace.

51.     In response to Vera and Zebrowski's cavalier criticism of Radosti's shoe choice, Radosti informed Vera and Zebrowski that she had to wear the Ugg boots as a result of her medical condition and asked for formal recognition of this accommodation.

52.     Radosti offered to provide Vera and Zebrowski with medical documentation supporting this need for accommodation.

53.     Echoing Benvenuto's denial of Radosti's request for a reasonable accommodation and hostile attitude toward Radosti's medical condition, Vera and Zebrowski refused Radosti's offer of medical documentation and refused to formally acknowledge her need for the accommodation.

54.     In early November 2015, in response to Radosti's continuing selection of her workplace footwear based on her doctor's advice, Vera suggested that Radosti be removed from her position as Manager of Personal Styling and Lead Supervisor.

55.     Specifically, Vera advised Radosti that because Radosti's medical condition was exacerbated by having to stand up for many hours, the Company had determined that Radosti's job was "too much for her" and that Radosti should, therefore, be relocated within the Company.

56.     When Radosti contested the proposed transfer of position, Vera manufactured a baseless, undocumented and pretextual criticism of Radosti's performance – that Radosti had not been sufficiently managing her subordinates – in an attempt to justify the proposed transfer.

57.     Notwithstanding the threatened transfer and pretextual criticism of her performance, Radosti continued to heed her doctor's advice and wear flat shoes and Ugg boots in the workplace.

58.     Thereafter, Vera escalated his pretextual criticisms of Radosti's job performance.

59.     In or about December 2015, Vera sent Radosti an email on a Saturday night when Radosti was not at work – after Radosti had worked eleven days straight – and criticized certain scheduling decisions Radosti had made.

60.     Radosti promptly responded to Vera's email with a comprehensive explanation of the rationale for her scheduling decisions, all of which were entirely consistent with Lord & Taylor policy.

61.     In this e-mail, Radosti also reiterated her concern with Vera and Benvenuto's criticism of Radosti's footwear choice despite knowledge of Radosti's medical condition.

62.     When Radosti returned to work the following week, Vera aggressively confronted Radosti, in the presence of Zebrowski, and speciously criticized Radosti for responding to his Saturday night correspondence over the weekend, rather than waiting to respond on Monday during normal working hours.

63. Zebrowski also retaliated against Radosti for continuing to seek a reasonable accommodation from Lord & Taylor.

64. In or about December 2015, Zebrowski told Radosti that although Radosti was doing a good job, she was undermining her stature in the workplace and antagonizing her supervisors by wearing Ugg boots instead of dressier Uggs with a heel.

65. Although Benvenuto, Vera and Zebrowski all were aware that Radosti's wearing of flat shoes was due to her medical condition and need for an accommodation, none of these supervisory personnel, or any other employee of Lord & Taylor, ever engaged Radosti in the interactive process required to determine an effective reasonable accommodation for Radosti's disabling medical condition.

66. For example, upon information and belief, the Company never contacted Radosti's physician to follow up on the physician's directive that Radosti wear only flat shoes that did not bind or place pressure on her foot deformity.

67. In addition, the Company never discussed with Radosti her specific medical needs or sought to identify alternative footwear options that might constitute a reasonable accommodation in compliance with Radosti's physician's advice.

68. Instead, Radosti's supervisors were hostile and aggressive towards Radosti due to her footwear needs and treated Radosti less favorably than her co-workers, ultimately terminating her employment in January 2016 for pretextual reasons.

69. The Company's discriminatory conduct violates the NYCHRL.

Radosti Experiences Differential Treatment Based on Age

70. Upon information and belief, the Company's hostility directed at Radosti for wearing flat shoes stands in stark contrast to its treatment of younger Lord & Taylor employees

11

at the Flagship Store who were permitted to violate clothing and footwear policy without sanction.

71.     Upon information and belief, Sokol and other personnel employed at the Flagship Store who were under the age of thirty (30) wore hi-top sneakers and jeans to work, in violation of Company policy, but were not criticized for this behavior by Vera, Zebrowski or Benvenuto.

72.     When Radosti raised concerns about this differential treatment to Benvenuto, citing specifically Sokol's choice of footwear and the Company's lack of criticism of Sokol, Benvenuto expressly condoned Sokol's footwear, characterizing it as a "fashion forward look" that many "young people" were wearing.

73.     Another young, female employee at the Company, Nicole Kennedy, wore virtually the same flat boots as Radosti, pairing them with leggings rather than the dressier attire wore by Radosti, but her footwear was not criticized or sanctioned by Vera, Zebrowski or Benvenuto.

74.     Moreover, on several occasions, Radosti observed Flagship Store managers including Benvenuto and Zebrowski, making discriminatory comments about other Company employees based on age.

75.     In one instance, in or about December 2015, Radosti was walking the third floor of the store with Zebrowski when Zebrowski pointed to some older Lord & Taylor design specialists who were in their 60's and 70's and said that the Company intended to replace them with younger people because they were "too old," notwithstanding that the designer specialists had a loyal following and brought in thousands of dollars.

76. In addition, on several occasions, Radosti attended meetings in the workplace where Lord & Taylor management consistently emphasized the need to draw in millennials to find a way to appeal to younger professionals rather than the classic Lord & Taylor customer.

77. In order to realize this need, Radosti was asked by Benvenuto to replace an older, female assistant (approximately 55 years of age) with younger assistants in their early 20's who would have "more energy, style, and technological savvy."

78. Radosti also observed Benvenuto encouraging older Lord & Taylor employees, including Radosti herself, to dress like their younger counterparts by wearing brighter colors and bright lipstick.

79. Upon information and belief, Lord & Taylor actively engaged in a pattern and practice of discrimination based on age against older employees.

80. Upon information and belief, as part of this pattern and practice of discrimination, Lord & Taylor aggressively phased out older employees under the pretext of layoffs in September and October 2015.

Radosti Complains of Unpaid Wages and Is Retaliated Against

81. Prior to September 2015, Radosti was paid for her overtime hours worked on the job.

82. The payment of overtime hours to Radosti was consistent with her Lord & Taylor Contract ("Contract"), which stated, "If overtime is authorized by store management, payment is calculated at 1.5 times the associate's base hourly rate in addition to payment of ½ of the associate's average hourly commission rate for any hours worked over 40 for the week."

83. Beginning in or about September 2015, after a new Human Resources Director, Danielle Grado ("Grado") was hired, Lord & Taylor stopped paying Radosti for all of her overtime hours.

84. Radosti also realized in or about September 2015 that she was not receiving all of her earned commissions, that she was not being paid for sick time, and that Lord & Taylor was taking deductions from her paycheck for transit but that she was not receiving any transit benefits.

85. When Radosti realized that she was not being properly compensated by the Company, she promptly contacted Grado to raise each of these issues.

86. During a meeting with Grado, Radosti informed Grado of the improper deductions, and the failure to pay overtime, sick time, and commissions.

87. In response, Grado told Radosti that she was not entitled to overtime pay or paid sick time.

88. Grado also told Radosti that she was not sure how commissions were calculated.

89. Following this meeting, and at Grado's request, Radosti sent Grado a copy of her Contract.

90. Radosti never received a response from Grado.

91. After Grado had responded dismissively to Radosti's compensation concerns, Radosti raised these concerns with Vera in or about November 2015, including her concerns about failure to pay overtime.

92. Although Vera appeared to be annoyed by Radosti's expressed compensation concerns, he told Radosti that he had informed Grado of the issues Radosti raised.

93.     Due to the unresponsiveness of both Grado and Vera, in or about December 2015, Radosti reached out to her Area Lord & Taylor Human Resources Representative, Eric Minnison ("Minnison"), for clarification of overtime pay and other compensation issues.

94.     In response to Radosti's inquiry, Minnison scheduled a time to meet with Radosti.

95.     Prior to their scheduled meeting, Minnison contacted Radosti and asked her to come see him immediately.

96.     When Radosti entered Minnison's office and went to sit down, Grado suddenly appeared from behind the door, entered the meeting, and berated Radosti for reaching out to another human resources representative.

97.     Radosti was surprised by Grado's hostility, because Grado had specifically instructed Lord & Taylor employees in a meeting earlier in the month to reach out to their area human resources representatives if they had issues in the workplace that they wanted to discuss.

98.     Grado then advised Radosti that even if Radosti worked overtime hours, she would not receive compensation for those hours because she was unauthorized to work overtime and because many of the hours were considered "non-productive" time for which Lord & Taylor does not pay overtime wages.

99.     During this meeting, Radosti disputed Grado's contention that her time had not been authorized and told Grado that she was objecting to, and opposing, the Company's actions regarding failure to pay overtime and sick time.

100.     Radosti also requested clarification on how her commissions were calculated as her compensation did not match the commissions paid.

101.     Radosti reiterated her objections to the Company's denial of overtime pay and sick time to Vera, but the matter remained unaddressed.

102. Similarly, Radosti's concerns that improper deductions were being taken from her paychecks for transit check benefits she never received also were never addressed by the Company.

103. In addition, Radosti never received the 25% employee discount she was entitled to as an employee of Lord & Taylor.

<u>Lord & Taylor Terminates Radosti's Employment for Pretextual Reasons</u>

104. On January 6, 2016, Radosti was suddenly called into a meeting by Vera and Grado.

105. During this meeting, Grado told Radosti that Radosti had been "flagged" since complaining about unpaid overtime.

106. During this meeting, Grado accused Radosti of stealing time and commissions and told her that her employment was terminated.

107. In response to this allegation, Radosti requested the opportunity to address the charges against her, including consulting her calendar in order to clarify the relevant facts as she knew the claims against her were unfounded.

108. This request was denied.

109. In addition, Grado told Radosti that Radosti had failed to perform functions concerning the clientelling system and report.

110. In response, Radosti explained that she did not have access to the system to perform the functions Grado was referring to, despite making several requests for such access.

111. Grado also criticized Radosti for failing to do CIMS customer reports.

112.     Radosti responded that she had been informed by Vera that Zebrowski would be completing this task, because Radosti was not given access to the information needed to complete the reports due to her job title within the Company.

113.     Finally, Grado also contended that Radosti had taken commissions on a sale that she had not earned relating to studio services.

114.     Radosti attempted to explain to Grado that a decision had been made by Radosti's supervisors –Young, Benvenuto, Julio Rios, and Michelle Isa – that because these "studio" sales were complicated and caused considerable confusion, Radosti's commission number should be routinely used to process these sales.

115.     Throughout the meeting, Radosti objected to each of Grado's patently pretextual accusations and provided reasonable explanations and information demonstrating the falsity of Grado's claims.

116.     Nonetheless, Grado refused to consider Radosti's responses, and informed Radosti that the termination decision was final.

117.     Upon information and belief, the Company did not permit Radosti to respond to the pretextual criticisms of Radosti's performance because the Company was aware that its claims against Radosti were baseless.

118.     The reasons given to Radosti for her termination are pretextual.

119.     Prior to her termination, Radosti had no legitimate performance failures and there had been no concerns regarding her character, honesty or integrity in the workplace.

120.     Given Radosti's performance at the Company, Lord & Taylor did not have a legitimate business justification for its abrupt termination of Radosti's employment.

121.    Lord & Taylor's termination of Radosti's employment was discriminatory based on age and disability, and retaliatory based on Radosti's raising the issue of unpaid overtime wages and commissions and improper pay deductions.

122.    The Company's failure to accommodate Radosti's request for a reasonable accommodation, and discrimination against Radosti based on her condition, further reveals a discriminatory bias against Radosti based on her disabling medical condition.

123.    In addition, the Company's hostility toward Radosti's dress in the workplace, in contrast to its treatment of younger, female employees, constitutes evidence of the Company's discriminatory bias against Radosti based on age.

124.    Finally, the Company's explicit acknowledgment of Radosti's complaints of unpaid wages as a motivating factor in Radosti's termination establishes that the termination was driven by retaliatory bias.

125.    Upon information and belief, Radosti was replaced by a 28-year-old male, who Radosti had herself interviewed and advised against hiring based on his lack of relevant experience.

126.    Upon information and belief, Radosti's replacement started work within days of Radosti's termination, suggesting that he had been trained and completed orientation while Radosti was still working for the Company.

127.    Upon information and belief, the Company's termination of Radosti reflects the Company's bias against Radosti based on disability, age, and the Company's retaliatory motives.

128.    Upon information and belief, Radosti's age, disability, and her complaints of failure to pay overtime, were motivating factors in Lord & Taylor's decision to terminate her employment.

129.  Lord & Taylor's decision to terminate Radosti based on her age and disability and in retaliation for opposing improper pay practices was performed willfully, intentionally, maliciously and with reckless indifference to Radosti's protected rights.

130.  The termination of Radosti caused her to suffer significant financial loss and experience significant emotional distress, including anxiety, anger, and humiliation.

## FIRST CAUSE OF ACTION
*Discrimination based on Disability in Violation of the NYCHRL, § 8-101 et seq.*

131.  Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

132.  As a result of the aforementioned actions, Defendants have discriminated against Plaintiff on account of her disability with respect to the terms, conditions and privileges of employment in violation of the New York City Administrative Code § 8-101 et seq.

133.  As a result of Defendants' discriminatory and adverse acts, Plaintiff has suffered damage, including, without limitation, deprivation of income and benefits, termination of employment, loss of opportunity for advancement and promotion, emotional pain, suffering, inconvenience, mental anguish, humiliation and damage to reputation and career.

## SECOND CAUSE OF ACTION
*Failure to Accommodate in Violation of the NYCHRL, § 8-101 et seq.*

134.  Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

135.  As a result of Defendants' aforesaid acts, Defendants have failed to accommodate Plaintiff's disability in violation of the New York City Administrative Code § 8-101, et seq.

136.  As a result of Defendants' discriminatory and adverse acts, Plaintiff has suffered damage, including, without limitation, deprivation of income and benefits, termination of

19

employment, loss of opportunity for advancement and promotion, emotional pain, suffering, inconvenience, mental anguish, humiliation and damage to reputation and career.

### THIRD CAUSE OF ACTION
*Discrimination based on Age in Violation of the NYCHRL, § 8-101 et seq.*

137.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

138.    As a result of the aforementioned actions, Defendants have discriminated against Plaintiff on account of her age with respect to the terms, conditions and privileges of employment in violation of the New York City Administrative Code § 8-101 et seq.

139.    As a result of Defendants' discriminatory and adverse acts, Plaintiff has suffered damage, including, without limitation, deprivation of income and benefits, termination of employment, loss of opportunity for advancement and promotion, emotional pain, suffering, inconvenience, mental anguish, humiliation and damage to reputation and career.

### FOURTH CAUSE OF ACTION
*Retaliation in Violation of the NYCHRL, § 8-101 et seq.*

140.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

141.    As a result of the aforementioned actions, Defendants retaliated against plaintiff in violation of the New York City Administrative Code § 8-101 et seq. when Defendants terminated plaintiff's employment in retaliation for plaintiff's opposition to discriminatory treatment.

142.    As a result of Defendants' retaliatory acts, Plaintiff has suffered damage, including, without limitation, deprivation of income and benefits, termination of employment, loss of opportunity for advancement and promotion, emotional pain, suffering, inconvenience,

mental anguish, humiliation and damage to reputation and career.

### FIFTH CAUSE OF ACTION
*Overtime Wages Pursuant to the FLSA, 29 U.S.C. § 201 et seq.*

143.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

144.     At all times relevant to Plaintiff's claims, Defendants were the employer of Plaintiff and Plaintiff was an employee of Defendants within the meaning of the FLSA, 29 U.S.C. § 203(d) & (e).

145.     At all times relevant to her claims, Plaintiff was employed by Defendants in an enterprise engaged in commerce with annual gross volumes of sales of not less than $500,000 within the meaning of the FLSA 29 U.S.C. § 203(s)(1).

146.     From approximately September 2015 to January 2016, Plaintiff often worked over forty hours per work week.

147.     During that time period, Plaintiff worked at least 40 hours of overtime for which she was not compensated at an overtime rate of pay.

148.     Defendants failed to pay Plaintiff overtime compensation at a rate of not less than one and one-half (1 ½) times Plaintiff's regular rate of pay for each hour of work over forty (40) hours per week in violation of the FLSA 29 U.S.C. § 207 (a)(1).

149.     Defendants had no reasonable grounds for believing its failure to pay Plaintiff overtime compensation was not a violation of the FLSA. Defendants' failure to pay Plaintiff overtime compensation was willful and not in good faith.

150.     Plaintiff has been damaged in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
*Unpaid Wages Pursuant to Article 19 of the NYLL, § 190 et seq., § 650 et seq.*

151.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

152.    At all times relevant to Plaintiff's claims, Defendants were the employer of Plaintiff and Plaintiff was an employee of Defendants within the meaning of the NYLL § 651(5) & (6).

153.    From approximately September 2015 to January 2016, Plaintiff often worked over forty hours per work week.

154.    During that time period, Plaintiff worked at least 40 hours of overtime for which she was not compensated at an overtime rate of pay.

155.    Defendants failed to pay Plaintiff overtime compensation at a rate of not less than one and one-half (1 ½) times Plaintiff's regular rate of pay for each hour of work over forty (40) hours per week in violation of Article 19 of the NYLL and the implementing regulations of the New York State Department of Labor, NYLL § 650 *et seq.*; 12 NYCRR 142-2.2.

156.    Defendants also failed to pay Plaintiff her earned commissions.

157.    Defendants also took improper deductions from Plaintiff's pay, in the form of alleged transit benefits that were never given to Plaintiff.

158.    Defendants had no reasonable grounds for believing its failure to pay Plaintiff these wages was not a violation of the NYLL.  Defendants' failure to pay Plaintiff overtime compensation, earned commission, and transit benefits was willful and not in good faith.

159.    Plaintiff has been damaged in an amount to be determined at trial.

### SEVENTH CAUSE OF ACTION
*Retaliation in violation of the FLSA, 29 U.S.C. § 201 et seq.*

160.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

161.    Radosti filed a complaint within the meaning of the FLSA retaliation statute, 29 U.S.C. § 215(a)(3), when she complained to Grado and Vera about unpaid overtime, in addition to unpaid earned commissions and improper deductions.

162.    Lord & Taylor terminated Radosti in retaliation for having filed such a complaint in violation of 29 U.S.C. § 215(a)(3) which provides that it is illegal for an employer to discharge an employee because the employee "has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter."

163.    As a result of this retaliatory discharge, Radosti will suffer past and future economic losses, including fringe and retirement benefits, attorneys' fees and emotional distress.

### EIGHTH CAUSE OF ACTION
*Retaliation in violation of the NYLL, § 215*

164.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

165.    Radosti filed a complaint within the meaning of the NYLL retaliation statute, NYLL § 215, when she complained to Grado and Vera about unpaid overtime, in addition to unpaid earned commissions and improper deductions.

166.    Lord & Taylor terminated Radosti in retaliation for having filed such a complaint in violation of NYLL § 215 which provides that it is illegal for an employer to discharge an employee because the employee "has made a complaint to his or her employer ... that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter ...."

167.    As a result of this retaliatory discharge, Radosti will suffer past and future economic losses, including fringe and retirement benefits, attorneys' fees and emotional distress.

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief against Defendants:

(1)      A declaratory judgment that the acts, policies, practices, and procedures complained of herein violated Plaintiff's rights as secured by the FLSA, the New York City Administrative Code, and the NYLL;

(2)      An injunction restraining and enjoining defendants from engaging in further discriminatory and retaliatory acts;

(3)      Reinstatement to the highest position to which Plaintiff was and would be entitled and/or front pay;

(4)      Actual damages in the form of (a) back-pay with interest based on Plaintiff's lost income, had she not been wrongfully terminated; (b) unpaid wages, unpaid benefits and overtime compensation, (b) reimbursement for health benefits, social security, experience, training opportunities, and other benefits; in an amount to be shown at trial; (c) interest on these amounts calculated at the prevailing rate;

(5)      Compensatory damages for emotional pain and suffering, inconvenience, mental anguish, humiliation, and loss of reputation in an amount not less than $500,000;

(6)      Liquidated damages as provided for by the FLSA and NYLL, in an amount to be shown at trial;

(7)      Punitive damages in an amount not less than $1,000,000;

(8)      Attorneys' fees;

(9)      Costs and disbursements;

(10)     Interest; and

(11)     Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury.

Dated: New York, New York
December 27, 2018

BANTLE & LEVY LLP

By: _____
Robert L. Levy
Sherie N. Buell
817 Broadway
New York, New York 10003
(212) 228-9666
Attorneys for Plaintiff